# UNITED STATES DISTRICT COURT

# WESTERN DISTRICT OF TEXAS

# WACO DIVISION

ROBERT NORTON,      Civil Action No. _____ **6:26-cv-00313**

Plaintiff,      JURY TRIAL DEMANDED

v.

TWO COUNTRY LANE–TEMPLE, LTD.;

ASSET LIVING, LLC;

COUNTRY LANE SENIORS

COMMUNITY;

GRAND RESERVE SENIORS

COMMUNITY;

GRAND RESERVE OWNER/OPERATOR

DOE ENTITY;

ANNIE NAUTA;

BEVERLY DANIELS;

TORI UCEDA;

JOHN/JANE DOES 1–20,

Defendants.

**PLAINTIFF'S ORIGINAL COMPLAINT FOR DAMAGES, DECLARATORY RELIEF, INJUNCTIVE RELIEF, AND JURY DEMAND**

## Contents

I. Nature of the Case

II. Parties

III. Jurisdiction and Venue

IV. Factual Allegations

A. Plaintiff, Country Lane, Grand Reserve, and the Approved Assistance Animal

B. Property Structure, Common Areas, and Management Control

C. Prior Notice to Asset Living and Country Lane in 2023

D. February–March 2026: Public Targeting of Ollie and Dog-Waste Operations

E. March 25, 2026 Lease Violation and Unsupported "Hazardous Materials" Characterization

F. Many Posted Pet-Waste Notices Using Ollie's Image

G. Corporate Notice, HUD Complaint, and Failure to Correct

H. May 2026 Audio-Capable Camera / Device in Resident Common Area

I. Protected Resident Flyer and Coordinated Reaction by Onsite Staff

J. Real-Time Monitoring / Friday Video-Recording Incident

K. May 11 and May 12, 2026 Retaliatory Notices to Vacate / Threatened Eviction

L. Coordinated Retaliation, Monitoring, File-Building, Resident Chilling, and Conspiracy Allegations

M. Quiet Enjoyment, Senior-Resident Intimidation, and Common-Area Interference

N. Spider / Pest / Common-Area Safety and Inadequate Remediation

O. Ticketing Systems, Controlled Records, Purge Risk, and False Reporting

P. Corporate Ratification and Preservation Issues

V. Causes of Action

Count 1 — Fair Housing Act Retaliation, Coercion, Intimidation, Threats, and Interference

Count 2 — Fair Housing Act Disability Discrimination / Discriminatory Terms, Conditions, Privileges, Services, and Facilities

Count 3 — Section 504 of the Rehabilitation Act

Count 4 — Texas Fair Housing Act Violations

Count 5 — Texas Landlord Retaliation / Retaliatory Notices to Vacate and Threatened Eviction

Count 6 — Texas Interception, Use, Disclosure, Aiding, or Knowingly Permitting Interception of Communications

Count 7 — Breach of Lease, Breach of Quiet Enjoyment, Bad-Faith Lease Administration, and Declaratory Relief

Count 8 — Invasion of Privacy / Intrusion upon Seclusion

Count 9 — Defamation, Libel, False Tenant-File Documentation, and Defamation by Implication

Count 10 — Negligent Hiring, Retention, Supervision, Training, and Failure to Correct

Count 11 — Civil Conspiracy / Concerted Action / Aiding and Knowingly Permitting Wrongful Conduct

Count 12 — Failure to Repair or Remedy Health-and-Safety Conditions / Negligent Common-Area Maintenance

Count 13 — Elder-Rights Interference, Coercion, Reprisal, and Senior-Resident Intimidation

Count 14 — Emergency Declaratory and Injunctive Relief

VI. Damages and Relief

VII. Preservation Notice

VIII. Jury Demand

IX. Prayer

Preliminary Exhibit List

Plaintiff Robert Norton files this Original Complaint against Defendants and alleges as follows:

## I. Nature of the Case

1.     This is a housing-rights, retaliation, interference, disability-accommodation, lease-enforcement, privacy/interception, senior-resident intimidation, false tenant-file documentation, retaliatory eviction, conspiracy/concerted-action, and common-area safety case arising from Defendants' conduct at Country Lane Seniors Community, Grand Reserve, and connected resident common areas in Temple, Texas.

2.     Plaintiff is a resident of Country Lane Seniors Community. Plaintiff has an approved emotional support / assistance animal, Ollie, supported by physician documentation provided to management.

3.     Country Lane and Grand Reserve operate as related senior residential communities with shared, adjacent, or connected common-area functions, including clubhouse, coffee room, reception, library, ballroom, gym, corridors, stairwells, atriums, and other controlled residential amenities. Asset Living is the paid management company responsible for management, staffing, supervision, policy implementation, complaint handling, and corporate oversight.

4.     Country Lane and/or Grand Reserve operate in a HUD-linked, federally regulated, subsidized, affordable-housing, and/or TDHCA-monitored environment. Defendants therefore had heightened obligations to administer lease rules, common-area rules, resident-file materials, disability-related accommodations, complaint processes, surveillance

policies, and senior-resident interactions lawfully, neutrally, and without retaliation, coercion, intimidation, interference, discrimination, or reprisal.

5.  Instead, Defendants and their agents engaged in a repeated and escalating course of conduct involving unsupported animal-related enforcement, public targeting of Plaintiff and his approved assistance animal, retaliatory use and re-use of lease-violation procedures, public use of Plaintiff's private resident/application-file materials, audio-capable surveillance in resident common areas, coordinated monitoring of Plaintiff, creation or manipulation of a false disciplinary paper trail, failure to maintain common areas safely, and failure by corporate/regional management to correct the misconduct after written notice.

6.  Defendants first served a May 11, 2026 Notice to Vacate for TDHCA-Regulated Affordable Housing, signed by Beverly Daniels without stated title or capacity, demanding possession within one day and citing only "See page 3 Paragraph 11 on TAA Apartment Lease contract." The notice was served within the first business hours after Plaintiff distributed resident communications concerning audio-capable cameras, resident privacy, and possible monitoring or recording of resident conversations in common areas.

7.  After Asset Living received Plaintiff's final corporate notice, after Asset Living acknowledged internal routing, after Plaintiff attached a draft federal complaint, and after Plaintiff gave Asset Living until 5:00 p.m. Central Time on May 12, 2026 to rescind the May 11 Notice to Vacate, Defendants served Plaintiff with a second Notice to Vacate dated May 12, 2026. The second notice demands possession within three days and attaches three pages of alleged incidents.

8.  The May 11 and May 12 Notices to Vacate materially change the case from ordinary lease-administration misconduct into threatened retaliatory eviction designed to intimidate

Plaintiff, chill resident communications, deter other senior residents from assisting, complaining, organizing, cooperating, or joining litigation, and create a pretextual disciplinary record after protected activity and corporate notice.

9. The conspiracy/concerted-action component is central. Plaintiff alleges that onsite personnel and corporate or property-level agents coordinated monitoring, documentation, intimidation, retaliation, threatened eviction, and file-building against Plaintiff and other residents perceived as complainants, critics, organizers, or witnesses. Plaintiff expects discovery of text messages, emails, ticketing-system records, camera/device logs, internal reports, delivery videos, resident-file entries, and communications among staff and corporate actors to confirm the coordinated nature and intent of the conduct.

10. Plaintiff does not currently plead a RICO claim. However, Plaintiff alleges that discovery may reveal false internal or external reporting, concealment, coordinated retaliation, record manipulation, and predicate-type facts relevant to broader civil or regulatory liability. Plaintiff seeks discovery broad enough to determine whether materially false reports or certifications were submitted or maintained concerning resident complaints, surveillance practices, management misconduct, safety conditions, threatened eviction, and compliance obligations.

11. Plaintiff brings this action for damages, emergency temporary, preliminary, and permanent injunctive relief, declaratory relief, statutory damages, punitive damages where authorized, attorney's fees and costs where authorized, and any other relief allowed by law.

## II. Parties

1. Plaintiff Robert Norton is an individual residing at Country Lane Seniors Community, 2916 Country Lane Drive, Apartment 1223, Temple, Texas 76504.

2.    Defendant Two Country Lane–Temple, Ltd. is believed to be an owner, operator, landlord, or ownership entity associated with Country Lane Seniors Community. Plaintiff will amend this Complaint if discovery shows the correct ownership entity has a different legal name.

3.    Defendant Asset Living is a property-management company that manages, supervises, operates, staffs, or controls Country Lane Seniors Community and/or Grand Reserve directly or through agents, employees, contractors, affiliated entities, regional personnel, HR personnel, risk personnel, compliance personnel, and legal or corporate decisionmakers.

4.    Defendant Country Lane Seniors Community is the residential property, management operation, assumed business name, or property-level entity operating at 2916 Country Lane Drive, Temple, Texas 76504. Plaintiff names this Defendant to the extent it is a suable entity or assumed name of the owner/operator.

5.    Defendant Grand Reserve Seniors Community is a related or adjacent residential property, management operation, assumed business name, or property-level entity connected to Country Lane and the Grand Reserve clubhouse/common-area facilities. Plaintiff names this Defendant to the extent it is a suable entity or assumed name of the owner/operator.

6.    Defendant Grand Reserve Owner/Operator Doe Entity is the presently unidentified legal ownership, landlord, operator, or control entity for Grand Reserve and the Grand Reserve clubhouse/common-area facilities. Plaintiff will amend after discovery or public-record confirmation.

7.    Defendant Annie Nauta was, at relevant times, an on-site property employee, assistant manager, representative, agent, or staff member at Country Lane. She personally participated in conduct alleged below, including lease-enforcement and delivery-related conduct.

8. Defendant Beverly Daniels was, at relevant times, an on-site property manager, representative, agent, or employee at Country Lane. She personally participated in, approved, ratified, or failed to correct conduct alleged below, including unsupported lease enforcement and the May 11, 2026 Notice to Vacate. The Notice to Vacate was signed by Beverly Daniels personally without stated title or capacity. Plaintiff seeks discovery concerning the capacity in which she signed it, the entity she purported to represent, and the written or delegated authority by which she was authorized to demand possession, terminate tenancy, or issue a Notice to Vacate for a TDHCA-regulated affordable-housing tenancy.

9. 9. Defendant Tori Uceda was, at relevant times, an on-site property employee, representative, agent, or staff member associated with Grand Reserve and/or the connected Country Lane / Grand Reserve management operations. Plaintiff is informed and believes she was involved in or had access to information concerning the same pattern of assistance-animal, lease-enforcement, resident-file, and management-conduct issues alleged herein.

10. John/Jane Does 1–20 are unknown individuals or entities who installed, configured, owned, accessed, monitored, controlled, authorized, managed, preserved, altered, or deleted data from the Blink camera/device or related surveillance system; who participated in retaliatory, discriminatory, lease-enforcement, or interference conduct; who used personal devices for property business; who maintained ticketing or complaint systems; or who participated in false reporting, record creation, record destruction, or coordinated retaliation.

11. At all relevant times, individual Defendants acted personally and/or as agents, employees, representatives, apparent agents, or co-conspirators of the entity Defendants.

12. Defendants are directly liable for their own conduct, for conduct they authorized, directed, participated in, ratified, concealed, aided, knowingly permitted, or failed to correct after notice.

13. The entity Defendants are vicariously liable for discriminatory housing practices, retaliation, lease administration, surveillance practices, and resident-file conduct by their agents and employees consistent with agency law.

14. Plaintiff brings this action individually at this time. Plaintiff reserves the right to seek leave to amend this Complaint under Federal Rule of Civil Procedure 15 to add additional plaintiffs, defendants, factual allegations, claims, class or collective allegations if legally appropriate, and related relief as additional residents, witnesses, ownership entities, management entities, employees, agents, or responsible persons are identified through investigation, public records, service returns, discovery, or further events.

### III. Jurisdiction and Venue

1. This Court has federal-question jurisdiction under 28 U.S.C. § 1331 because this action arises under federal law, including the Fair Housing Act, 42 U.S.C. §§ 3601 et seq., including 42 U.S.C. § 3617, and Section 504 of the Rehabilitation Act, 29 U.S.C. § 794, to the extent Defendants receive, administer, manage, or participate in federal financial assistance.

2. This Court has jurisdiction over Plaintiff's Fair Housing Act claims under 42 U.S.C. § 3613.

3. This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's related state-law claims because they arise from the same case or controversy, including the same housing relationship, property, management structure, assistance-animal dispute, lease-

enforcement conduct, retaliation, failure-to-correct facts, resident privacy/surveillance controversy, common-area safety conditions, and coordinated-conduct allegations.

4.    Venue is proper in the Western District of Texas, Waco Division, because the property is located in Temple, Bell County, Texas; the events occurred in Bell County; Defendants conduct business there; and a substantial part of the events giving rise to the claims occurred there.

## IV. Factual Allegations
### A. Plaintiff, Country Lane, Grand Reserve, and the Approved Assistance Animal

1.    Plaintiff resides at Country Lane Seniors Community in Temple, Texas.

2.    Country Lane is a senior residential community and operates in a HUD-linked, federally regulated, subsidized, affordable-housing, and/or TDHCA-monitored environment.

3.    Grand Reserve is a related or adjacent senior residential community, entity, or property operation sharing, connecting to, or controlling relevant clubhouse/common-area facilities used by Country Lane residents, including the Grand Reserve clubhouse referenced in the disputed lease-violation notices.

4.    Plaintiff's dog, Ollie, is an approved emotional support / assistance animal supported by physician documentation provided to management.

5.    Because Ollie is an approved assistance animal, Defendants were required to administer rules, policies, practices, services, common-area privileges, lease enforcement, and resident interactions consistently with federal and state fair-housing obligations.

6.    Defendants knew or should have known that selectively targeting Plaintiff or Ollie, publicly singling out the animal, using resident-file materials to shame Plaintiff, imposing arbitrary or after-the-fact restrictions, or retaliating against Plaintiff for complaints would create disability-related retaliation, interference, and compliance concerns.

## B. Property Structure, Common Areas, and Management Control

1. The premises include approximately 200 residential units across two three-story resident buildings, plus a clubhouse/common-area connector in the middle.

2. The resident buildings include roughly six residential floors total, approximately 600 or more yards of corridors, atriums with plants, semi-enclosed corridors open to atrium areas, and three stairwells per building, for six stairwells total.

3. The coffee room, ballroom, library, lobby, reception area, clubhouse, gym, corridors, atriums, stairwells, patios, unit-adjacent outdoor seating areas, and related facilities are not public sidewalks or public spaces. They are controlled residential common areas, common amenities, leased-premises amenities, and resident access areas.

4. Residents use these controlled common areas for private social interaction, meetings, coffee, recreation, access to units, access to amenities, and resident communications. Management controls these areas, the rules governing them, the cameras/devices placed in them, the maintenance performed in them, and the records generated about resident conduct in them.

5. Each apartment has a small outside patio and a dedicated outdoor furniture/meeting area outside the main entrance roughly the width of the apartment, approximately 25 feet long, which residents can use as a personal outdoor space. Defendants control, maintain, or regulate the corridors and unit-adjacent spaces connecting to those areas.

6. These property-design facts are important because residents cannot reasonably avoid the corridors, stairwells, atriums, USPS mailbox areas, and unit-adjacent areas, and because Defendants' use of surveillance, intimidation, selective enforcement, pest neglect, and retaliatory documentation in such areas materially affects residents' use and enjoyment of

their homes. Plaintiff is informed that residents have expressed fear about using common areas after the surveillance, retaliation, and threatened-eviction events described herein.

### C. Prior Notice to Asset Living and Country Lane in 2023

1. In January 2023, prior Country Lane management initiated an animal-related enforcement action involving Ollie.

2. Plaintiff immediately denied the accusations and stated that Ollie had not behaved aggressively, had remained under control, and had not threatened or injured anyone.

3. Plaintiff also provided or referenced statements from residents supporting that Ollie was friendly, gentle, and not aggressive.

4. During the January 2023 dispute, then-manager Alan/Allen Kougl physically stood over Plaintiff in his office while Plaintiff was seated and told Plaintiff, in substance, that if Ollie did not leave that day, Kougl would physically remove him. Plaintiff understood this as a threat of physical violence and removal against Plaintiff and/or his approved assistance animal.

5. Plaintiff is informed and believes that prior management, including former manager Alan/Allen Kougl, used threats of eviction, housing consequences, selective enforcement, intimidation, and retaliatory management practices to control, punish, or silence residents. Several witnesses to this behavior have come forward or have indicated knowledge of similar conduct.

6. Plaintiff escalated the 2023 matter to Asset Living/regional management and requested investigation, expungement/removal of the unsupported animal-related enforcement record, and higher-level review of management conduct.

7. Asset Living therefore had notice by January 2023 that Country Lane had serious staff-conduct concerns involving assistance-animal enforcement, threats or intimidation, unsupported or exaggerated lease-enforcement allegations, and management overreach.

8. The 2023 incident and prior management culture are relevant to corporate notice, pattern, negligent supervision, failure to correct, motive, absence of mistake, ratification, and Defendants' knowledge. Plaintiff does not rely on all older events as independent timely damages claims unless discovery or additional plaintiffs establish live claims.

9. Plaintiff is informed and believes that former manager Alan/Allen Kougl had background, conduct, relationship, or conflict issues that Asset Living, ownership, or regional management knew or should have known required heightened supervision, restriction, or removal. Plaintiff is further informed and believes that Kougl may have had a personal or family relationship with ownership or investor interests. Discovery is necessary to determine what Asset Living, ownership, and regional personnel knew about Kougl, when they knew it, and why his management culture was allowed to influence the property and staff.

### D. February–March 2026: Public Targeting of Ollie and Dog-Waste Operations

1. Before the March 2026 lease violation notice, Defendant Annie Nauta twice loudly stated in front of or near other residents that Plaintiff's dog smelled and asked whether Plaintiff bathed him.

2. Ollie did not have a material odor problem. Plaintiff responded by email with factual information concerning appropriate bathing frequency for Boxers and the risk of over-bathing.

3.  Around the same general period, residents were repeatedly failing to pick up dog waste in the dog park, and staff repeatedly failed to keep the dog-bag dispenser stocked for multiple days at a time.

4.  Plaintiff complained to the office about these operational failures and the office's failure to manage them.

5.  Rather than treat the issue as a property-wide sanitation and operations problem, staff treated Plaintiff and Ollie as the problem.

6.  Defendant Nauta later confronted Plaintiff in the coffee room by loudly placing dog bags in front of him, as though the dog-waste issue were Plaintiff's personal failure rather than a property-wide operational failure.

7.  These events provide context for the later escalation into unsupported lease enforcement, public comments, use of Ollie's image from private resident-file materials in posted notices, and conduct that reasonably appeared designed or calculated to shame, defame, embarrass, and intimidate Plaintiff.

## E. March 25, 2026 Lease Violation and Unsupported "Hazardous Materials" Characterization

1.  On or about March 25, 2026, Defendant Daniels and/or other on-site management issued Plaintiff a lease-violation notice arising from disposal of bagged dog waste in a wastebasket.

2.  The notice characterized the issue as involving "hazardous materials" or similar language.

3.  Plaintiff disputed the notice and requested a private meeting. To date, management has not provided the requested meeting or the specific lease, addendum, policy, and factual basis requested by Plaintiff.

4. On or about March 26, 2026, Plaintiff delivered a written letter by hand to Beverly Daniels requesting that management identify the exact current lease clause allegedly violated, by paragraph number; the exact addendum paragraph allegedly violated, by paragraph number; any written community policy allegedly violated; the basis for characterizing bagged dog waste in a waste receptacle as "hazardous waste"; and the factual basis for attributing the alleged waste to Plaintiff or Ollie. No response was ever received.

5. Plaintiff also explained that the Assistance/Service Animal Addendum language he reviewed concerned conduct such as disturbing others, threatening others, creating a nuisance, disrupting business operations, or posing a direct threat to persons or property, but did not establish a waste-disposal rule requiring use of a specific dog-waste station or prohibiting use of ordinary trash receptacles. Management had also unilaterally removed two waste-disposal stations at the front of the property before these events, making it necessary to walk more than two hundred yards to access one from the front of the property. Plaintiff is informed and believes many pet owners at the property are disabled and use walkers, wheelchairs, or other mobility aids.

6. Plaintiff further explained that, under Texas law, hazardous waste is defined by reference to EPA/RCRA hazardous-waste classifications and that ordinary refuse is treated separately as municipal solid waste. Bagged pet waste in ordinary trash does not reasonably fit the Texas hazardous-waste definition.

7. Defendants did not provide a valid current lease clause, addendum paragraph, written policy, or legal basis sufficient to support the notice.

8. Defendants did not withdraw the notice or remove all related adverse implications from Plaintiff's resident file, and Plaintiff is informed and believes Defendants continued to

display multiple copies of a poster or notice using Ollie's image in common areas and

entrances.

### F. Many Posted Pet-Waste Notices Using Ollie's Image

1.      After the March 25, 2026 lease-violation dispute, Defendants posted a "Pet Waste Notice" or similar notice in multiple places at the property, including clubhouse entrances and areas residents used when entering and leaving common areas.

2.      The posted notice used an image of Ollie.

3.      Plaintiff is informed and believes the image was taken from Plaintiff's private rental application, resident file, assistance-animal documentation, or other internal resident-file materials.

4.      The notice publicly associated Plaintiff's approved assistance animal with alleged wrongdoing and a newly announced pet-waste rule.

5.      Plaintiff has the only Boxer at the property, making the image identifiable to residents familiar with Plaintiff and Ollie.

6.      Defendants' public use of Ollie's image was not necessary to communicate any pet-waste policy. Defendants could have used a generic icon, stock photo, text-only notice, or neutral policy statement.

7.      Instead, Defendants used Plaintiff's dog's image in a manner that publicly singled out, embarrassed, and intimidated Plaintiff.

8.      The posting appeared after Plaintiff complained and after Defendants issued or attempted to justify unsupported lease enforcement.

9.      Plaintiff's resident-file and assistance-animal materials included disability-related and medical-provider information submitted for purposes of a housing accommodation. Whether or not Defendants are HIPAA-covered entities, Defendants had fair-housing, disability-accommodation, privacy, confidentiality, and reasonable property-management duties to restrict access to such materials and to use them only for legitimate accommodation, lease-administration, or legal-compliance purposes.

10.     Plaintiff is informed and believes that the image of Ollie used in the posted notices was accessed, obtained, copied, photographed, scanned, transmitted, approved, printed, or distributed from Plaintiff's private resident-file, rental-application, assistance-animal documentation, or other management-controlled records.

11.     Plaintiff is further informed and believes that personnel not assigned to Plaintiff's Country Lane tenancy, including Grand Reserve personnel or personnel acting across both property operations, may have accessed, obtained, copied, photographed, scanned, transmitted, or used Country Lane resident-file materials relating to Plaintiff and Ollie without legitimate need or authority.

12.     Plaintiff is further informed and believes that this may have involved cross-entity access by Grand Reserve personnel, including or acting through Tori Uceda. Plaintiff pleads this allegation on information and belief because Defendants exclusively control the resident files, physical file-storage areas, file-cabinet access, employee access authority, copying/scanning/printing practices, source-image files, posted notices, drafts, approval records, emails, texts, and internal communications needed to determine who accessed, copied, photographed, scanned, approved, printed, posted, or distributed the image.

13.     If Grand Reserve personnel had access to Country Lane resident-file or assistance-animal materials, then either the Country Lane and Grand Reserve operations were functionally integrated for resident-file and management purposes, or Defendants failed to maintain adequate confidentiality, physical-file controls, supervision, and data-separation safeguards over private resident materials.

14.     This conduct was retaliatory, intimidating, interfering, and burdened Plaintiff's equal use and enjoyment of the property and common areas.

15.     Plaintiff owns or controls the rights in the photograph of Ollie used by Defendants. Defendants had no license, consent, authorization, lease right, resident-file right, or business necessity to reproduce, print, publish, display, distribute, or post the photograph in resident common areas or management communications. Plaintiff reserves the right to add a copyright-infringement claim under 17 U.S.C. §§ 501 and 504 after registration.

G. Corporate Notice, HUD Complaint, and Failure to Correct

1.     On or about March 27, 2026, Plaintiff submitted a written complaint to Asset Living/regional management/corporate personnel concerning Annie Nauta's conduct, the public posting, the lease violation, and related management failures.

2.     Plaintiff attached supporting evidence, including the complaint letter, poster, March 26 letter to Beverly Daniels, and the March 25 lease-violation notice.

3.     Asset Living acknowledged the complaint and created internal HR ticket CASE-818655.

4.     Plaintiff requested removal of all posted notices using Ollie's image, identification of who authorized the image, confirmation that resident application materials would not be used for public shaming, investigation of Annie Nauta's conduct, clarification of the actual pet-waste policy, and confirmation that no unsupported lease violation or adverse notation would be maintained.

5. Asset Living did not provide meaningful corrective action.

6. Asset Living's later response stated, in substance, that Plaintiff's concerns had been reviewed and that the on-site team would continue to manage day-to-day operations in accordance with community guidelines.

7. That response was inadequate because Plaintiff's complaint concerned the on-site team's own conduct.

8. By returning the matter to the on-site team, refusing to provide specifics, failing to remove/cure all effects of the challenged conduct, and failing to provide accountability, Asset Living ratified, condoned, or knowingly failed to correct the conduct after notice.

9. On or about April 1, 2026, after no meaningful correction, Plaintiff submitted a HUD housing-discrimination complaint concerning disability-related retaliation, interference, intimidation, and discriminatory treatment.

10. Plaintiff also notified Defendants that the HUD complaint had been submitted.

11. Defendants' conduct continued or remained uncorrected after notice.

## H. May 2026 Audio-Capable Camera / Device in Resident Common Area

1. In May 2026, Plaintiff observed a newly installed Blink camera/device in the coffee room / clubhouse area.

2. The device was placed in or near a common area where residents converse, including private or semi-private resident discussions about personal matters, management issues, and tenant concerns.

3. Plaintiff personally photographed the device from the front and back.

4. Plaintiff personally heard a female voice come through the device saying, "Leave it alone," while Plaintiff was near the device.

5. The voice confirmed that the device was capable of live audio communication and that someone was remotely accessing or monitoring the device at that time.

6. Plaintiff is informed and believes the device is a Blink-branded camera/device capable of two-way audio and/or microphone functionality.

7. Plaintiff observed no adequate signage or notice warning residents that common-area conversations could be remotely monitored, intercepted, recorded, stored, reviewed, used, or disclosed.

8. Plaintiff submitted a request to the Temple Police Department asking for investigation of possible illegal audio recording or interception of oral communications.

9. Plaintiff requested that law enforcement determine whether the cameras contained microphones, whether audio recording or live audio monitoring was enabled, whether recordings included audio tracks, who installed/configured/owned/operated/accessed the system, whether tenants were notified, whether signs specifically disclosed audio recording, and whether any recordings were disclosed, reviewed, used, downloaded, or shared.

10. Plaintiff seeks civil discovery concerning the same issues, including Blink/Amazon account records, device logs, live-view logs, speaker-use logs, account users, deletion logs, audio settings, recordings, cloud-retention records, user access, and all communications regarding the device.

11. If Defendants intercepted, attempted to intercept, used, disclosed, aided, or knowingly permitted the interception of resident conversations without proper consent, Defendants are liable under Texas Civil Practice & Remedies Code Chapter 123 and other applicable law.

### I. Protected Resident Flyer and Coordinated Reaction by Onsite Staff

1. On or about Friday, May 8, 2026, Plaintiff distributed a resident flyer concerning audio-capable cameras, resident privacy, and possible monitoring or recording of resident conversations in common areas.

2. The flyer was protected resident communication, tenant-organizing activity, complaint activity, and/or conduct connected to Plaintiff's exercise of statutory, lease, fair-housing, privacy, and resident-association rights.

3. Plaintiff provided the flyer to Asset Living HR and corporate management as an attachment to his May 11, 2026 email so Asset Living could see exactly what protected resident communication preceded the May 11 lease-violation notice.

4. Plaintiff alleges that onsite staff reacted aggressively and retaliatorily to the flyer and to Plaintiff's efforts to document the absence of signage or notice regarding audio-capable devices.

### J. Real-Time Monitoring / Friday Video-Recording Incident

1. On or about Friday, after Plaintiff left a function in the ballroom, Plaintiff walked approximately fifteen seconds toward the coffee room, reception area, and library to document the absence of signs or notices warning residents that audio-capable devices were being used or that conversations could be monitored or recorded.

2. When Plaintiff arrived in the adjacent library common area, Beverly Daniels or another onsite management employee was already present holding up a phone to video-record Plaintiff.

3. The timing and circumstances support a reasonable inference that Defendants' employees or agents were either monitoring Plaintiff in real time through camera feeds or other surveillance systems, or that staff had been instructed to immediately alert management

when Plaintiff moved through the premises or approached areas where surveillance devices, resident notices, or privacy issues were being documented.

4. This incident was an overt act in furtherance of Defendants' coordinated course of conduct to intimidate, deter, document, chill, and retaliate against Plaintiff for protected activity, including resident organizing, complaint activity, documentation of suspected privacy violations, and communication with other residents about management's conduct.

5. This was not ordinary security activity. It was targeted recording of a resident after that resident raised privacy and surveillance complaints, and it occurred in a context suggesting real-time coordination or alerting by staff.

### K. May 11 and May 12, 2026 Retaliatory Notices to Vacate / Threatened Eviction

1. On May 11, 2026, within the first business hours after Plaintiff distributed resident information concerning audio-capable cameras, resident privacy, and possible monitoring or recording of resident conversations, Defendants served Plaintiff with a Notice to Vacate for TDHCA-Regulated Affordable Housing.

2. The Notice to Vacate is dated May 11, 2026, identifies Two Country Lane–Temple, Ltd. as owner, is signed by Beverly Daniels without stated title or capacity, and demands that Plaintiff vacate within one day.

3. The Notice to Vacate states the reason for termination only as: "See page 3 Paragraph 11 on TAA Apartment Lease contract." Paragraph 11 contains multiple subparts and does not, by itself, identify the specific conduct allegedly supporting termination, possession, or eviction.

4. The Notice to Vacate does not identify the specific alleged act, date, time, location, witness, evidence, lease/addendum provision, written policy, rule, prior notice, opportunity to cure, good-cause basis, or legal authority for demanding possession within one day in a TDHCA-

regulated affordable-housing property. The notice also checks a box stating that the property does not offer an appeal process. Plaintiff alleges that, in context, this language was reasonably calculated to intimidate Plaintiff into leaving without asserting legal rights and to send a message to other residents. Plaintiff is informed and believes that property practice or policy generally requires multiple lease violations before eviction, further supporting selective enforcement, targeting, and pretext. Plaintiff denies that he has any valid lease violations.

5.    Plaintiff denies that there is any lawful, factual, lease-based, or good-cause basis to terminate his tenancy, demand possession, or pursue eviction. Plaintiff does not consent to vacate and disputes the Notice to Vacate in full.

6.    The Notice to Vacate was served shortly after Plaintiff's protected resident flyer and after Asset Living had already been placed on notice of management-conduct concerns, privacy concerns, surveillance concerns, retaliation concerns, tenant-file documentation concerns, and evidence-preservation issues.

7.    The timing, one-day possession demand, vague lease reference, failure to state specific facts, failure to identify good cause, senior/TDHCA-regulated affordable-housing context, and prior corporate notice support a reasonable inference that the Notice to Vacate was retaliatory, pretextual, disproportionate, and designed to intimidate Plaintiff and chill protected resident communications.

8.    Plaintiff is informed and believes that the May 11 delivery was videotaped and witnessed as part of management practice. The delivery video, witness identity, instructions to deliver, instructions to videotape, creation/edit/print metadata, internal communications, and all approvals are directly relevant and must be preserved.

9.  Plaintiff is informed and believes that Annie Nauta, from Country Lane, delivered the May 11 paperwork, and that a maintenance employee served as the witness. Plaintiff has heard that the maintenance employee may be under employment pressure, which is relevant to witness credibility, staff pressure, and preservation.

10. Before Plaintiff discovered that the document actually served was a Notice to Vacate, Plaintiff mistakenly referenced the earlier March 25, 2026 lease-violation notice in a May 11 email because he had photographed the wrong document. This mistake was promptly corrected the same night.

11. On May 11, 2026, Plaintiff sent Asset Living HR a corrected and supplemental email under CASE-818655 explaining that the document actually served was a Notice to Vacate for TDHCA-Regulated Affordable Housing, not merely a lease-violation notice, and demanding immediate rescission, preservation of evidence, no eviction filing, correction of tenant-file entries, legal/risk/compliance review, and identification of Beverly Daniels's capacity and authority.

12. The corrected May 11 email also notified Asset Living and Beverly Daniels that Texas law does not allow employees, managers, owners, or corporate agents to assume they are personally insulated merely because they acted for a company, and cited Texas authority recognizing personal liability for torts committed by corporate agents.

13. The May 11 Notice to Vacate is not an isolated lease document. It is an adverse housing action and threatened eviction served immediately after protected activity and after corporate notice, making it central evidence of retaliation, coercion, intimidation, bad-faith lease administration, corporate ratification, and need for emergency relief.

14. After Asset Living received Plaintiff's final corporate notice, after Asset Living acknowledged routing the matter internally, after Plaintiff attached a draft federal complaint, and after Plaintiff gave Asset Living until 5:00 p.m. Central Time on May 12, 2026 to rescind the May 11 Notice to Vacate, Defendants served Plaintiff with a second Notice to Vacate dated May 12, 2026.

15. The May 12 Notice to Vacate identifies Two Country Lane-Temple, Ltd. as owner, is signed by Beverly Daniels, demands that Plaintiff vacate within three days, checks that the property does not offer a process to appeal the notice, and states the alleged lease violation as: "See attached pages 1, 2 and 3."

16. The attached pages list alleged incidents beginning March 5, 2026, after the management disputes, resident communications, dog-park/sign issues, camera/privacy disputes, and protected complaint activity had begun. The attachment cites lease provisions and includes allegations concerning Plaintiff's resident communications, written maintenance submissions, communications with Temple Police, documentation activity, and objections to audio-capable cameras in resident common areas.

17. Plaintiff denies the false, exaggerated, misleading, and retaliatory allegations in the May 12 attachment. Plaintiff specifically denies bullying or harassing any resident, denies taking a remote control from any resident, and denies that there was any dispute with any resident over a remote control. Plaintiff alleges that references to "notes" being placed under the office door appear to concern written maintenance submissions placed through the one-copy maintenance-report system outside the office.

18. Plaintiff further denies placing his phone in anyone's face. Plaintiff has video evidence showing he was approximately five feet away during the May 12 office interaction. Plaintiff

alleges that he was documenting management conduct in a non-private office/front-office context during an active legal dispute and for documentation related to anticipated lawful service of process; Annie Nauta stated, "Don't take my picture"; Beverly Daniels stated, "Get out of my office"; and Plaintiff then left and said nothing further.

19. Plaintiff has not touched, turned, unplugged, covered, or altered any camera since the police interaction in which Plaintiff was informed that police would not investigate the audio-capable camera issue. Before that interaction, Plaintiff believed the camera/device conduct may have been unlawful because he personally heard a voice come through the device in a resident common area and observed no adequate notice that resident conversations might be monitored or recorded.

20. The May 12 Notice does not cure the retaliation problem. It confirms escalation after corporate notice and after receipt of a draft federal complaint. It also shows that onsite staff are willing to include false, exaggerated, and easily disproven allegations in an eviction notice, including the claim that Plaintiff's phone was "in" anyone's face, which Plaintiff alleges the preserved video will rebut.

21. On May 12, 2026, after the second Notice to Vacate was served, Plaintiff sent Asset Living and Beverly Daniels a further legal notice denying the allegations, identifying the second notice as post-corporate-notice escalation, renewing preservation demands, and demanding that both the May 11 and May 12 Notices to Vacate be withdrawn and rescinded.

22. The May 11 and May 12 Notices to Vacate are not isolated lease documents. They are adverse housing actions and threatened eviction served immediately after protected activity and corporate notice, making them central evidence of retaliation, coercion, intimidation,

bad-faith lease administration, corporate ratification, protected-activity interference, and need for emergency relief.

**L. Coordinated Retaliation, Monitoring, File-Building, Resident Chilling, and Conspiracy Allegations**

1. Defendants engaged in a coordinated course of conduct to monitor, document, intimidate, threaten eviction against, and retaliate against Plaintiff and other residents who complained about management conduct, privacy violations, surveillance practices, safety issues, resident mistreatment, theft or property-loss complaints, resident-on-resident misconduct, or interference with tenant rights.

2. The conduct was not isolated. It involved onsite management, staff, agents, and corporate entities responsible for ownership, management, supervision, policies, compliance, resident communications, surveillance, resident-file administration, lease enforcement, and eviction decisions.

3. Plaintiff alleges on information and belief that Defendants' employees and agents used formal and informal channels, including email, text messages, phone calls, personal mobile devices, incident reports, ticketing systems, resident files, camera systems, delivery videos, staff instructions, and internal management communications, to identify, monitor, report, document, intimidate, and retaliate against residents perceived as critics, complainants, organizers, or witnesses.

4. Plaintiff further alleges that Defendants' staff selectively documented Plaintiff and other residents while failing to properly document, investigate, escalate, or correct management misconduct, privacy violations, resident complaints, threats, theft or property-loss complaints, harassment, unsafe conditions, and violations by favored residents or residents whose conduct management chose to ignore.

5. The object of the coordinated course of conduct was to maintain control over senior residents, discourage complaints, prevent scrutiny of surveillance practices and management misconduct, protect Defendants from resident organizing, deter witnesses, and create a paper trail to justify adverse action or eviction against Plaintiff after he complained.

6. Overt acts included monitoring Plaintiff, using or allowing audio-capable devices in common areas, remotely speaking through the device, recording Plaintiff with a phone, issuing or reissuing disputed lease-violation paperwork, serving the May 11 one-day Notice to Vacate and the May 12 three-day Notice to Vacate, exaggerating a disputed trash-disposal allegation as "hazardous materials," selectively documenting Plaintiff, threatening or implying housing consequences, failing to respond to resident complaints, concealing or omitting material information from reports, and using internal systems to track complaints while maintaining control over whether records were preserved, altered, minimized, or purged.

7. The severity and timing of the May 11 and May 12 Notices to Vacate were reasonably calculated to chill not only Plaintiff, but also other residents who might speak with Plaintiff, cooperate as witnesses, join a complaint, support resident organizing, or complain about management misconduct.

8. After the Notices to Vacate and related events, Plaintiff spoke with residents who expressed fear of management retaliation, described Plaintiff as "brave" for pursuing the issue, and indicated interest in joining or supporting litigation. Plaintiff also spoke with residents who reported additional complaints, including alleged thefts, property-loss issues, and management failures to respond adequately.

9.   These resident communications are relevant to Defendants' chilling effect, management culture, pattern and practice, resident intimidation, common knowledge of bullying, discovery, and the need for injunctive relief. Plaintiff will identify witnesses and obtain declarations or testimony as appropriate.

10.  Plaintiff is informed and believes that the current staff culture was shaped in part by prior management under Alan/Allen Kougl, who Plaintiff alleges used threats, intimidation, and housing consequences to control residents. Plaintiff is further informed and believes that Asset Living, ownership, or regional decisionmakers knew or should have known of prior management problems and failed to implement adequate supervision, correction, or professional controls.

11.  The conspiracy/concerted-action allegations are pleaded to support liability, punitive intent, motive, discovery, and the inference that Defendants' conduct was intentional, coordinated, and designed to intimidate a senior resident and chill protected activity, not merely negligent property management.

## M. Quiet Enjoyment, Senior-Resident Intimidation, and Common-Area Interference

1.   Defendants breached and interfered with Plaintiff's right to quiet enjoyment by making the residential common areas uncomfortable, intimidating, unsafe, and coercive for ordinary resident use.

2.   Defendants' conduct included audio-capable surveillance in resident common areas, lack of adequate notice, selective monitoring, staff recording of Plaintiff, retaliatory staff presence, failure to respond to resident complaints, threats or implied threats of adverse housing consequences, and conduct designed to deter residents from freely using common amenities or speaking with one another.

3.  The coffee room, ballroom, library, lobby, reception area, clubhouse, gym, corridors, stairwells, atriums, patios, unit-adjacent outdoor seating areas, and related facilities are controlled residential common areas and amenities provided as part of the residential community.

4.  Defendants' use of surveillance, intimidation, selective enforcement, and retaliatory monitoring materially impaired Plaintiff's and other residents' ability to use those amenities as intended.

5.  Defendants' acts and omissions destroyed or substantially impaired Plaintiff's quiet enjoyment by causing Plaintiff and other residents to reasonably fear that ordinary conversations, tenant-organizing communications, complaints, and private resident interactions in common areas were being monitored, intercepted, recorded, disclosed, or used against them.

6.  The senior-housing context heightens the seriousness of Defendants' conduct. Residents may be elderly, medically vulnerable, mobility-impaired, socially dependent on common areas, or less able to resist intimidation, surveillance, threats of eviction, or retaliatory documentation by management.

7.  Plaintiff alleges that management conduct designed to intimidate, monitor, document, or punish senior residents for complaints and communications violates or supports violations of elderly-resident rights, dignity, privacy, association, freedom from coercion or reprisal, and fair-housing protections where applicable.

## N. Spider / Pest / Common-Area Safety and Inadequate Remediation

1.  Defendants have failed to maintain the controlled common areas, semi-enclosed corridors, stairwells, atriums, unit-adjacent areas, patios, and resident outdoor seating areas in a safe,

sanitary, and usable condition, despite actual or constructive notice of widespread recurring spiders, webs, and suspected egg sacs.

2. Residents have reported a recurring and widespread spider condition in the internal semi-exterior corridors, including spiders and webs near resident doors and along corridors residents must use to enter, exit, and access community amenities.

3. The resident buildings contain three residential stories, approximately 200 residential units, internal corridors totaling approximately 600 or more yards, atrium openings with plants, six stairwells total, and a connecting clubhouse/common-area structure. The corridors are enclosed above but open to atrium areas with plants, creating conditions conducive to recurring spider harborage, webbing, and pest recurrence. Plaintiff alleges that in the three years he has lived at the property, hallway floors, stairwells, and other covered areas have often not been adequately cleaned, with stains, debris, and even feces left for extended periods.

4. Residents have expressed concern that some spiders may be brown recluse, black widow, or other medically significant venomous spiders. Plaintiff does not presently have expert confirmation of the species of every spider observed, but the recurring presence of spiders, webs, and suspected egg sacs in senior residential common corridors creates an objectively reasonable health-and-safety concern. Plaintiff has observed numerous webs and suspected egg sacs in corridor areas outside apartment entrances and has also observed or been informed of hornet, bee, or wasp nests and swarms in or near common areas.

5. Plaintiff has observed spiders and webs within a few feet of his outside door and is informed that spiders and webs appear frequently in corridors, in some places allegedly every ten feet.

6.   Defendants' periodic spraying every few months has been inadequate because Defendants have failed to implement an effective remediation plan, including regular inspection, species identification, web removal, egg-sac removal, crack-and-crevice treatment, atrium vegetation control, harborage reduction, entry-point sealing, resident notice, treatment documentation, and follow-up inspection.

7.   Plaintiff has not heard or seen meaningful pest treatment in outside or semi-inside areas, including corridors, stairwells, atrium-adjacent areas, patios, unit-adjacent outdoor seating areas, or exterior/semi-exterior spaces.

8.   The spider infestation and Defendants' failure to remediate it further interferes with Plaintiff's and other residents' quiet enjoyment and use of the premises. The internal corridors are necessary residential access areas, not optional public spaces.

9.   Defendants had actual or constructive notice of the condition because the spiders and webs are visible in common corridors, including near resident doors, and because residents have complained about the prevalence of spiders in the internal hallways.

10.  Defendants' failure to correct the condition after notice supports claims for negligent maintenance, failure to remedy health-and-safety conditions, breach of quiet enjoyment, and bad-faith disregard of resident safety.

## O. Ticketing Systems, Controlled Records, Purge Risk, and False Reporting

1.   Defendants maintain or control internal ticketing systems, complaint logs, resident files, incident reports, work-order systems, surveillance records, Freshservice or similar HR/case systems, pest-control records, vendor records, and corporate communications that are directly relevant to Plaintiff's claims.

2.    These systems are entirely within Defendants' control and may permit deletion, alteration, reclassification, reassignment, closure, non-entry, or purging of resident complaints and management incidents.

3.    Plaintiff alleges on information and belief that Defendants' internal records may not accurately reflect the actual volume, seriousness, or content of resident complaints because management had motive and opportunity to omit, minimize, misclassify, alter, close, or purge complaints involving surveillance, privacy, retaliation, threats, resident safety, pests, common-area conditions, and management misconduct.

4.    Plaintiff seeks preservation and discovery of all physical and electronic resident-file custody practices, file-storage procedures, key/access controls, file-cabinet locations, employee access authority, copying/scanning/printing practices, drafts, posted notices, internal messages, emails, text messages, metadata where available, audit trails where available, deletion logs where available, user histories where available, escalation notes, attachments, backups, archived records, and communications showing who accessed, removed, copied, photographed, scanned, transmitted, approved, printed, posted, displayed, removed, or retained the image of Ollie used in the posted notices.

5.    Plaintiff specifically seeks discovery concerning whether any Grand Reserve personnel accessed, used, copied, photographed, scanned, transmitted, or approved use of Country Lane resident-file, rental-application, or assistance-animal materials, and whether such access reflected functional integration between the properties, lack of adequate file-separation controls, or failure by Asset Living and ownership to supervise confidential resident records.

6. Plaintiff alleges on information and belief that Defendants created, maintained, submitted, or relied upon reports that omitted, minimized, misstated, or concealed material facts concerning resident complaints, surveillance devices, audio monitoring, threats of eviction, retaliation, safety incidents, management misconduct, pest conditions, and management's failure to respond.

7. Such records include, but are not limited to, reports to owners, Asset Living, corporate supervisors, insurers, HUD, TDHCA, LIHTC compliance personnel, auditors, law enforcement, vendors, and other governmental or quasi-governmental entities.

8. Plaintiff seeks discovery to determine whether Defendants' false or misleading records were used to conceal misconduct, defeat resident complaints, maintain regulatory compliance, preserve management fees, obtain or retain subsidies or tax-credit benefits, avoid enforcement action, mislead owners or regulators, or retaliate against residents.

## P. Corporate Ratification and Preservation Issues

1. Defendants knew or reasonably should have known that litigation, regulatory complaints, or law-enforcement review were likely once Plaintiff and other residents complained about surveillance, audio-capable devices, privacy violations, retaliation, threats, resident safety, pest conditions, and management misconduct.

2. Defendants therefore had a duty to preserve relevant evidence, including video, audio, camera/device logs, account access records, text messages, emails, incident reports, ticketing-system entries, complaint records, resident files, staff instructions, management reports, owner communications, vendor records, HR records, risk records, compliance communications, and personal-device communications used for property business.

3. Plaintiff alleges that any deletion, overwriting, failure to suspend auto-delete settings, failure to preserve personal-device communications used for work, loss of device logs,

closure or purging of tickets, or destruction of resident complaints after notice of these disputes would constitute spoliation or evidence of consciousness of liability.

4.     Asset Living was placed on repeated corporate notice and had an opportunity to correct local staff conduct. If Asset Living leaves the disputed notices in place, leaves the same personnel in control, fails to preserve evidence, fails to correct the resident-file record, or permits further retaliation or escalation after notice, Plaintiff will treat that conduct as corporate ratification rather than merely local staff misconduct.

## V. Causes of Action
### Count 1 — Fair Housing Act Retaliation, Coercion, Intimidation, Threats, and Interference (42 U.S.C. § 3617)

1.     Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2.     Plaintiff exercised and attempted to exercise rights protected by the Fair Housing Act, including disability-related housing rights, assistance-animal rights, the right to complain about discriminatory or retaliatory housing practices, the right to equal use and enjoyment of the dwelling and common areas, and the right to aid or encourage other residents in asserting housing rights.

3.     Defendants knew Plaintiff had an approved assistance animal and knew Plaintiff had complained about property operations, assistance-animal-related conduct, lease enforcement, privacy, surveillance, and retaliatory treatment.

4.     Defendants retaliated, coerced, intimidated, threatened, or interfered with Plaintiff by issuing unsupported lease-enforcement notices related to Ollie; publicly singling out Plaintiff and Ollie; using Ollie's image from resident/application-file materials in public postings; publicly embarrassing Plaintiff through staff comments; failing to correct or remove retaliatory materials after notice; maintaining adverse lease-enforcement implications without valid support; returning Plaintiff's complaint to the on-site team

despite the complaint being about the on-site team; failing to supervise, train, or discipline staff after notice; using or permitting audio-capable surveillance in resident common areas; recording or monitoring Plaintiff; and engaging in or knowingly permitting a continuing course of conduct that would deter a reasonable resident from exercising protected housing rights.

5.    Defendants further retaliated, coerced, intimidated, threatened, and interfered with Plaintiff by serving the May 11 one-day Notice to Vacate for TDHCA-Regulated Affordable Housing within the first business hours after Plaintiff distributed protected resident communications concerning audio-capable cameras and resident privacy, and then serving the May 12 three-day Notice to Vacate after Asset Living received corporate notice, acknowledged routing, received a draft federal complaint, and failed to rescind the prior Notice.

6.    Defendants' conduct violated 42 U.S.C. § 3617.

7.    Plaintiff suffered damages, including emotional distress, humiliation, loss of use and enjoyment, interference with housing rights, loss of privacy, fear of eviction, time and expense, and other damages to be proven at trial.

8.    Plaintiff seeks actual damages, punitive damages where permitted, emergency temporary, preliminary, and permanent injunctive relief, declaratory relief, attorney's fees, costs, and all other relief authorized by 42 U.S.C. § 3613 and related law.

**Count 2 — Fair Housing Act Disability Discrimination / Discriminatory Terms, Conditions, Privileges, Services, and Facilities (42 U.S.C. § 3604(f); 24 C.F.R. Part 100)**

1.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2.    Plaintiff has a disability-related need for an approved assistance animal.

3.    Defendants knew or should have known of Plaintiff's approved assistance-animal status.

4. Defendants imposed, attempted to impose, or selectively enforced terms, conditions, privileges, services, facilities, rules, policies, or practices in a manner that burdened Plaintiff's equal use and enjoyment of his dwelling, common areas, and housing-related services.

5. Defendants' actions included unsupported lease enforcement, after-the-fact policy making, public targeting of Plaintiff's assistance animal, use of resident-file materials, and failure to administer dog-waste operations and assistance-animal-related issues neutrally and professionally.

6. Defendants' conduct constituted discriminatory treatment, interference with equal enjoyment, and/or failure to reasonably administer or modify rules, policies, practices, or services where necessary to afford equal housing opportunity.

7. Defendants removed dog-waste stations, making it necessary to walk hundreds of yards to use remaining stations, and Plaintiff is informed and believes Defendants often failed to empty the remaining stations so that they were overflowing with feces in plastic bags, sometimes for multiple days in a row. These facts support Plaintiff's allegation that Defendants treated an operational and accessibility problem as a basis to target Plaintiff and his approved assistance animal.

8. Plaintiff seeks damages, declaratory relief, injunctive relief, attorney's fees, costs, and all other relief allowed by law.

### Count 3 — Section 504 of the Rehabilitation Act (29 U.S.C. § 794)

1. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2. Plaintiff is an individual with a disability or is otherwise protected by Section 504 because he has a disability-related need for an approved assistance animal.

3.    Defendants are recipients, operators, managers, agents, or participants in a program or activity receiving federal financial assistance, or they operate housing subject to Section 504 obligations. Discovery will further confirm the precise funding structure.

4.    Defendants discriminated against Plaintiff, retaliated against Plaintiff, interfered with Plaintiff's protected rights, or denied Plaintiff equal benefit of housing services, facilities, rules, policies, practices, or common-area use by reason of disability-related assistance-animal status and protected complaint activity.

5.    Plaintiff seeks damages, injunctive relief, declaratory relief, attorney's fees, costs, and all other relief allowed by law.

### Count 4 — Texas Fair Housing Act Violations (Texas Property Code Chapter 301)

1.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2.    Defendants' conduct violated Texas fair-housing protections by discriminating in the terms, conditions, privileges, services, or facilities connected with Plaintiff's dwelling and by retaliating, intimidating, interfering, or otherwise acting against Plaintiff because he exercised fair-housing rights.

3.    Plaintiff seeks all relief available under Texas law, including damages, equitable relief, costs, attorney's fees where authorized, and any other appropriate relief.

### Count 5 — Texas Landlord Retaliation / Retaliatory Notices to Vacate and Threatened Eviction (Texas Property Code § 92.331)

1.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2.    Plaintiff exercised rights under the lease and law, complained in good faith about property conditions and management conduct, asserted fair-housing and assistance-animal rights, opposed unsupported lease enforcement, submitted or pursued complaints, documented conditions, distributed resident communications, and engaged or attempted to engage in

resident organizing regarding living conditions, privacy, surveillance, and management conduct.

3.   Defendants retaliated by issuing or maintaining unsupported lease-violation notices, serving the May 11 one-day Notice to Vacate after Plaintiff distributed the resident flyer, serving the May 12 three-day Notice to Vacate after corporate notice and receipt of a draft federal complaint, singling out Plaintiff and Ollie, interfering with Plaintiff's use and enjoyment of the property, monitoring or recording Plaintiff, chilling resident communications, and failing to correct or withdraw adverse actions after notice.

4.   The May 11 and May 12, 2026 Notices to Vacate constitute adverse housing actions, threatened eviction, attempted lease termination, and/or bad-faith conduct materially interfering with Plaintiff's rights under the lease and law.

5.   Defendants' conduct was in bad faith, retaliatory, disproportionate, and materially interfered with Plaintiff's rights under the lease and law.

6.   Defendants' conduct violated Texas Property Code § 92.331 and related provisions.

7.   Plaintiff seeks damages, statutory relief if available, emergency injunctive relief, declaratory relief, costs, and all other relief allowed by law.

### Count 6 — Texas Interception, Use, Disclosure, Aiding, or Knowingly Permitting Interception of Communications (Texas Civil Practice & Remedies Code Chapter 123)

1.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2.   Residents at Country Lane and Grand Reserve, including Plaintiff, used the coffee room, clubhouse, reception area, library, lobby, gym, ballroom, and common areas for oral communications.

3.   Plaintiff and other residents reasonably expected that private resident conversations in controlled resident common areas were not being secretly intercepted, monitored, recorded,

stored, reviewed, used, or disclosed by Defendants through audio-capable devices absent clear notice and lawful consent.

4. Defendants installed, operated, controlled, accessed, aided, knowingly permitted, or failed to prevent the interception or attempted interception of oral communications through an audio-capable Blink camera/device or related system.

5. Plaintiff personally heard a female voice come through the device, proving the device was capable of live audio interaction and was being accessed remotely.

6. Discovery is necessary to determine the full extent of interception, attempted interception, storage, review, access, disclosure, deletion, use, and who authorized or knowingly permitted such conduct.

7. To the extent Defendants intercepted, attempted to intercept, used, disclosed, aided, or knowingly permitted interception of communications, Defendants are liable under Texas Civil Practice & Remedies Code Chapter 123.

8. Plaintiff seeks injunctive relief, statutory damages of $10,000 per occurrence where proven, actual damages, punitive damages, attorney's fees, costs, and all other relief allowed by law.

### Count 7 — Breach of Lease, Breach of Quiet Enjoyment, Bad-Faith Lease Administration, and Declaratory Relief

1. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2. Plaintiff and Defendants are parties to a lease or housing contract governing Plaintiff's tenancy.

3. Defendants were required to administer the lease, addenda, rules, notices, common-area amenities, resident communications, resident file, complaint process, surveillance policies, and resident discipline fairly, accurately, consistently, lawfully, and in good faith.

4. Defendants breached the lease and/or wrongfully administered it by issuing or maintaining lease-violation paperwork and the May 11 and May 12, 2026 Notices to Vacate without a valid, non-retaliatory, good-cause basis, without a clearly identified lease/addendum provision, and without a valid good-cause basis for terminating a TDHCA-regulated affordable-housing tenancy.

5. Defendants further breached or wrongfully administered the lease relationship by treating properly bagged pet waste as "hazardous materials" without valid legal or lease basis, imposing after-the-fact policy restrictions, reissuing or relying on disputed lease paperwork, serving the May 11 one-day Notice to Vacate, serving the May 12 three-day Notice to Vacate, and failing to withdraw adverse notations after written demand for the actual lease basis.

6. Defendants breached and interfered with Plaintiff's quiet enjoyment by creating intimidating, surveilled, unsafe, retaliatory, and uncomfortable common-area conditions; by chilling resident communications; by threatening possession through repeated Notices to Vacate; by maintaining false or prejudicial tenant-file records; and by failing to maintain common areas safely and sanitarily.

7. Plaintiff seeks a declaration that the March 25, 2026 lease-violation notice and the May 11 and May 12, 2026 Notices to Vacate are invalid, unsupported, unenforceable, retaliatory, and must be withdrawn and removed from Plaintiff's resident file.

8. Plaintiff also seeks emergency injunctive relief preventing Defendants from filing, pursuing, relying on, or escalating any eviction action based on the May 11 Notice to Vacate, the May 12 Notice to Vacate, or related disputed paperwork, and preventing Defendants from using the notices against Plaintiff in lease renewal, eviction, nonrenewal,

adverse file notations, housing decisions, future enforcement, or resident-treatment decisions.

### Count 8 — Invasion of Privacy / Intrusion upon Seclusion

1. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2. Plaintiff and other residents used controlled residential common areas for private and personal conversations, resident interactions, complaints, social discussions, and tenant communications.

3. Defendants intentionally intruded, physically or otherwise, upon Plaintiff's and residents' seclusion, solitude, or private affairs by installing, accessing, using, permitting, or failing to supervise audio-capable cameras/devices in common areas; remotely monitoring or communicating through such devices; recording or following Plaintiff; and using surveillance or staff communications to target Plaintiff after protected complaints.

4. Defendants further invaded Plaintiff's privacy and misused private resident-file materials by taking, copying, photographing, scanning, reproducing, displaying, posting, or otherwise publishing an image of Plaintiff's approved assistance animal from Plaintiff's resident file, rental application, assistance-animal documentation, or other private management-controlled records. The image made Plaintiff identifiable to residents familiar with Plaintiff and Ollie and was used in a manner that publicly associated Plaintiff and his approved assistance animal with alleged waste-disposal misconduct. This use was unnecessary to communicate any policy, served no legitimate accommodation-related purpose, and instead operated as public shaming, retaliation, intimidation, and interference with Plaintiff's equal use and enjoyment of the property.

5. A reasonable person would find secret or inadequately disclosed audio monitoring, live remote access, staff recording, and targeted monitoring in senior residential common areas

highly offensive, especially when used in connection with retaliation, intimidation, tenant-file documentation, or suppression of resident communications.

6.   Plaintiff suffered loss of privacy, distress, loss of quiet enjoyment, chilling of resident communication, time burden, and other damages to be proven at trial.

## Count 9 — Defamation, Libel, False Tenant-File Documentation, and Defamation by Implication (Pled in the Alternative)

1.   Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2.   Defendants published oral and written statements, tenant-file documents, lease-violation notices, the Notices to Vacate, visual postings, or implications concerning Plaintiff and Ollie that falsely implied Plaintiff and his approved assistance animal had created unsanitary conditions, possessed or disposed of hazardous materials, violated lease obligations, or engaged in misconduct warranting termination or eviction.

3.   Defendants published these statements and postings to residents, staff, property personnel, corporate personnel, resident files, management systems, and others at the property or within Asset Living's management structure.

4.   The use of Ollie's image made Plaintiff identifiable to residents familiar with Plaintiff and Ollie.

5.   The misuse of Plaintiff's private resident-file or assistance-animal image in a public pet-waste posting amplified the defamatory implication because it caused residents to associate Plaintiff and his approved assistance animal with alleged waste-disposal misconduct, unsanitary conduct, or lease-rule violations, even though Defendants could have used a neutral policy notice, generic image, stock image, or text-only notice.

6. The "hazardous materials" characterization and the Notices to Vacate were false, exaggerated, damaging, and defamatory by implication when applied to a disputed bagged pet-waste disposal allegation and when used to imply good cause for eviction.

7. The statements, notices, and postings were false, misleading, defamatory by implication, or published with negligence, malice, retaliatory motive, or reckless disregard for the truth.

8. Plaintiff suffered reputational harm, humiliation, embarrassment, emotional distress, harm to tenant-file status, fear of eviction, and other damages.

9. Plaintiff pleads this count in the alternative and recognizes that some of the same facts also support stronger statutory, retaliation, privacy, and injunctive claims.

## Count 10 — Negligent Hiring, Retention, Supervision, Training, and Failure to Correct

1. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2. The entity Defendants owed residents, including Plaintiff, duties to use reasonable care in hiring, retaining, supervising, training, investigating, correcting, disciplining, removing, or controlling on-site staff responsible for a senior HUD-linked residential community.

3. Defendants knew or should have known from prior complaints, the 2023 Ollie dispute, staff-conduct concerns, assistance-animal enforcement issues, March/April 2026 complaints, the HUD complaint, the camera/audio complaint, and the May 11 HR notice that Country Lane and Grand Reserve had recurring site-level problems involving arbitrary rule enforcement, intimidation, unsupported lease notices, retaliation, surveillance, false documentation, and failure to respect resident rights.

4. Defendants breached those duties by failing to investigate, discipline, supervise, train, remove, or correct staff after notice.

5. Defendants further breached their duties by failing to implement and enforce policies concerning audio-capable cameras, resident recording, common-area monitoring, signage,

complaint handling, escalation of resident safety concerns, preservation of evidence, staff use of personal devices, retaliation, fair treatment of residents, pest remediation, and senior-resident rights.

6. Defendants further breached their duties by failing to control access to confidential resident-file materials, rental-application materials, assistance-animal documentation, disability-related accommodation materials, resident images, physical file cabinets, copying/scanning equipment, printing equipment, and cross-property management records, including by permitting or failing to prevent personnel from one property or entity from accessing, copying, photographing, scanning, transmitting, or using resident-file materials from another property or entity without legitimate need or authority.

7. Defendants' breach proximately caused Plaintiff's damages.

## Count 11 — Civil Conspiracy / Concerted Action / Aiding and Knowingly Permitting Wrongful Conduct

1. Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2. Defendants, through their employees, agents, managers, management company, ownership entities, property-level entities, and related corporate actors, participated in a common plan to suppress, deter, document, intimidate, threaten eviction against, or retaliate against Plaintiff and other residents who complained, organized, documented conditions, objected to management conduct, or considered cooperating as witnesses or plaintiffs.

3. The object of the conspiracy or coordinated course of conduct was to maintain control over residents, discourage complaints, prevent scrutiny of surveillance practices and management misconduct, protect Defendants from resident organizing, defeat or chill regulatory complaints, manufacture lease-enforcement records, and create pretextual documentation against Plaintiff.

4. Defendants had a meeting of the minds, express or tacit, shown by their coordinated timing, repeated documentation, staff communications, targeted monitoring, delivery procedures, use of internal systems, corporate notice followed by inaction, and mutual participation in or ratification of wrongful conduct.

5. Overt acts in furtherance of the common plan included monitoring residents, using or allowing audio-capable devices in common areas, recording Plaintiff, selectively documenting Plaintiff, issuing and reissuing disputed notices, serving the May 11 and May 12 Notices to Vacate, threatening possession within one day, backdating or using disputed paperwork, threatening or implying housing consequences, failing to respond to resident complaints, concealing or omitting material information from reports, and using internal systems to track complaints while retaining control over preservation, alteration, minimization, or purging of records.

6. Additional overt acts included accessing, copying, photographing, scanning, transmitting, approving, printing, or publicly posting Plaintiff's private resident-file or assistance-animal image, and using confidential resident-file materials to single out, shame, intimidate, or retaliate against Plaintiff.

7. The underlying unlawful acts include, among others, retaliation, interference, invasion of privacy, unlawful interception or attempted interception, defamation or false documentation, negligent supervision after notice, breach of quiet enjoyment, retaliatory threatened eviction, and bad-faith lease administration.

8. To the extent Defendants assert that some actors were employees of the same entity, Plaintiff pleads in the alternative that the coordinated conduct involved multiple separate legal entities, property-level operations, owner/operator entities, management-company

actors, and individual actions outside legitimate property-management purposes or undertaken for personal, retaliatory, or unlawful objectives.

9.    Plaintiff suffered damages as a result.

### Count 12 — Failure to Repair or Remedy Health-and-Safety Conditions / Negligent Common-Area Maintenance

1.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2.    Defendants owned, operated, managed, controlled, maintained, or were responsible for controlled common areas, semi-enclosed corridors, stairwells, atriums, unit-adjacent areas, patios, resident outdoor seating areas, clubhouse areas, and other residential access routes.

3.    Defendants owed residents duties to reasonably inspect, maintain, clean, and remediate common areas, including corridors, atriums, plant areas, doorways, ceilings, corners, wall joints, stairwells, patios, resident outdoor seating areas, and other pest-harboring locations.

4.    Defendants breached those duties by relying on intermittent spraying while failing to implement an effective integrated pest-management plan, failing to remove spider webs and egg sacs, failing to inspect recurring locations, failing to seal entry points, failing to control vegetation and harborage conditions in the atriums, failing to document and respond adequately to resident complaints, and failing to maintain semi-enclosed access areas in a safe, sanitary, and usable condition.

5.    The risk is heightened because the property is a senior residential community. Residents may be elderly, medically vulnerable, visually impaired, mobility-impaired, or less able to avoid spiders, webs, bites, or unsafe corridor conditions.

6.    Defendants' failure created a foreseeable risk of spider bites, pest exposure, fear of using common areas, loss of safe access to residential units and common amenities, and loss of quiet enjoyment.

7.    Plaintiff seeks damages and injunctive relief requiring inspection, preservation of pest-control records, species identification, meaningful remediation, and common-area maintenance correction.

**Count 13 — Elder-Rights Interference, Coercion, Reprisal, and Senior-Resident Intimidation**

1.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2.    Country Lane and Grand Reserve are senior residential communities. Plaintiff and many residents are elderly or senior residents within the meaning of applicable Texas elder-rights and senior-housing protections.

3.    Texas law recognizes that elderly individuals have rights to exercise civil rights free from interference, coercion, discrimination, and reprisal; to privacy; to dignity and respect; to complain about treatment; and to associate and communicate with others.

4.    Defendants' conduct interfered with, coerced, intimidated, or reprised against Plaintiff and other senior residents by using or permitting audio-capable surveillance, monitoring resident communications, recording Plaintiff, threatening or implying housing consequences, serving a one-day Notice to Vacate, using lease-violation documentation as intimidation, creating or manipulating tenant-file records, selectively enforcing rules, failing to respond to complaints, and maintaining a management culture that chilled resident speech and complaints.

5.    The May 11 and May 12 Notices to Vacate served after protected resident communications and corporate notice are especially coercive in a senior affordable-housing community because it threatens the loss of housing and is reasonably likely to deter other residents from speaking, organizing, cooperating, or complaining.

6.    To the extent Texas elder-rights provisions provide a direct or supplemental basis for relief, Plaintiff seeks damages, declaratory relief, injunctive relief, and any other available remedy. In all events, Defendants' senior-resident intimidation and reprisal support Plaintiff's claims for retaliation, invasion of privacy, negligence, quiet-enjoyment interference, punitive damages where available, and injunctive relief.

## Count 14 — Emergency Declaratory and Injunctive Relief

1.    Plaintiff incorporates the preceding paragraphs as if fully set forth herein.

2.    An actual controversy exists regarding the validity of the disputed March 25 lease-violation notice, the May 11 and May 12 Notices to Vacate, the use of "hazardous materials" language, Defendants' authority to demand possession within one or three days, Beverly Daniels's authority or capacity to sign the Notice to Vacate, Defendants' authority to enforce alleged Grand Reserve clubhouse conduct against a Country Lane resident, the legality and notice requirements for audio-capable cameras in resident common areas, the preservation of surveillance and tenant-file records, and Defendants' duty to stop retaliation and preserve evidence.

3.    Plaintiff seeks a declaration that the disputed lease-violation notice and the May 11 and May 12 Notices to Vacate are invalid, unsupported, unenforceable, retaliatory, pretextual, and must be withdrawn and removed from Plaintiff's tenant file.

4.    Plaintiff seeks emergency temporary, preliminary, and permanent injunctive relief prohibiting Defendants from filing, pursuing, prosecuting, relying on, or escalating any eviction action based on the May 11 Notice to Vacate, the May 12 Notice to Vacate, or related disputed paperwork unless and until this Court determines Defendants may lawfully do so.

5.     Plaintiff seeks injunctive relief requiring Defendants to cease retaliation, preserve evidence, correct records, disclose and disable unlawful audio functionality, implement lawful surveillance and resident privacy policies, maintain common areas safely, and prevent further intimidation, harassment, recording, monitoring, eviction threats, or false documentation of Plaintiff and other residents who complain or participate in protected activity.

## VI. Damages and Relief

1.     Plaintiff seeks actual damages, including but not limited to emotional distress, humiliation, embarrassment, loss of quiet enjoyment, interference with housing rights, loss of privacy, fear and burden caused by the threatened eviction and repeated Notices to Vacate, time spent responding to Defendants' conduct, costs incurred, reputational harm, tenant-file harm, misuse of private resident-file materials, misuse of disability-related accommodation materials, unauthorized use of Plaintiff's assistance-animal image, and other damages to be proven at trial.

2.     Plaintiff seeks statutory damages where available, including damages under Texas Civil Practice & Remedies Code Chapter 123 for each proven occurrence of unlawful interception, attempted interception, use, disclosure, aiding, or knowingly permitting interception.

3.     Plaintiff seeks punitive or exemplary damages where permitted by law based on intentional, malicious, reckless, retaliatory, coordinated, or knowingly indifferent conduct.

4.     Plaintiff seeks declaratory relief that the March 25, 2026 lease-violation notice and the May 11, 2026 Notice to Vacate are invalid, unsupported, unenforceable, retaliatory, pretextual, and must be withdrawn and removed from Plaintiff's resident file.

5.   Plaintiff seeks temporary, preliminary, and permanent injunctive relief requiring Defendants to withdraw the disputed lease violation and Notice to Vacate; remove adverse notations; cease filing, pursuing, prosecuting, relying on, or escalating any eviction action based on the disputed notices; cease using resident-file materials in public postings without lawful authorization; identify, preserve, and produce all source files, drafts, print records, copying/scanning records, approval records, physical-file custody information, and communications concerning use of Ollie's image or any private resident-file or assistance-animal materials; remove or disable audio functionality from cameras/devices in resident common areas unless lawful notice and consent requirements are satisfied; preserve and produce camera/device settings, user access logs, recordings, audio-enable settings, cloud records, vendor records, deletion history, delivery videos, and tenant-file metadata; stop retaliating, intimidating, coercing, threatening, monitoring, recording, or interfering with Plaintiff or other residents who complain, organize, file HUD/TWC complaints, or assert housing rights; provide fair-housing, assistance-animal, anti-retaliation, lease-enforcement, privacy, elder-rights, evidence-preservation, and common-area maintenance training to staff; restore reasonable pet-waste disposal access and maintain dog-bag supplies consistently; establish a neutral written process for lease violations supported by specific lease clauses and factual evidence; remediate common-area pest conditions; and provide any other corrective action the Court deems just.

6.   Plaintiff seeks attorney's fees and costs where authorized, including under the Fair Housing Act and Texas Civil Practice & Remedies Code Chapter 123.

7.   Plaintiff seeks pre-judgment interest, post-judgment interest, taxable costs, and all other relief to which he is entitled.

## VII. Preservation Notice

1.  Defendants are on notice to preserve all potentially relevant evidence, including emails, text messages, chats, phone records, personal-device communications used for property business, incident reports, lease-violation records, resident complaints, HR records, Freshservice or similar tickets, drafts of posters, source image files, camera footage, Blink/Amazon account records, device settings, user access logs, live-view logs, speaker-use logs, audio-enable settings, recordings, deletion logs, delivery videos, vendor communications, pest-control records, resident-file access logs, metadata, audit trails, and communications concerning Plaintiff, Ollie, Annie Nauta, Beverly Daniels, Tori Uceda, Beverly Daniels's phone-recording incident, Alan/Allen Kougl, the March 25 lease violation, the May 11 Notice to Vacate and delivery, the May 12 Notice to Vacate and delivery, the pet-waste poster, the HUD complaint, the resident flyer, the coffee-room camera/device, common-area surveillance, spiders/pests/common-area maintenance, and resident complaints.

2.  Defendants are further on notice to preserve all records showing creation, printing, signature, scanning, entry, delivery, posting, videotaping, witnessing, alteration, deletion, backdating, reissuance, use, or reliance upon any disputed lease-violation notice, Notice to Vacate, demand for possession, resident-file record, or eviction-related record concerning Plaintiff.

3.  Defendants are further on notice to preserve all records concerning the May 12, 2026 Notice to Vacate and its attachment, including drafts, creation/edit/print records, delivery video, witness information, emails, text messages, camera footage, resident statements, employee statements, maintenance reports, police-complaint references, surveillance-device

records, and all communications among Country Lane, Grand Reserve, Asset Living, ownership, HR, legal, risk, compliance, maintenance, and onsite staff.

4.  Defendants are further on notice to preserve all physical resident-file custody records, file-storage procedures, key/access controls, file-cabinet location information, employee access authority records, copying/scanning/printing records, drafts, source images, posted notices, approval records, removal records, emails, text messages, internal messages, and communications concerning access to, copying of, photographing of, scanning of, transmission of, approval of, posting of, display of, removal of, or retention of Plaintiff's resident-file, rental-application, assistance-animal, disability-accommodation, medical-provider, or animal-image materials.

5.  Defendants are further on notice to preserve all records concerning the capacity and authority of any person who signed, authorized, approved, delivered, witnessed, videotaped, or relied on the May 11 Notice to Vacate, including Beverly Daniels.

6.  Defendants are further on notice that destruction, alteration, deletion, overwriting, closure, purging, or failure to preserve relevant evidence after notice may support sanctions, adverse inferences where allowed, spoliation remedies, punitive intent, consciousness of liability, and additional claims or remedies.

## VIII. Jury Demand
1.  Plaintiff demands a trial by jury on all issues so triable.

## IX. Prayer
WHEREFORE, Plaintiff Robert Norton respectfully requests that the Court enter judgment in his favor and against Defendants, jointly and severally where permitted, and award:

1.  actual damages;

2.  statutory damages;

3.    punitive/exemplary damages where authorized;

4.    declaratory relief;

5.    temporary, preliminary, and permanent injunctive relief;

6.    attorney's fees and costs where authorized;

7.    pre-judgment and post-judgment interest;

8.    taxable court costs;

9.    an order requiring Defendants to immediately remove all signs, notices, postings, copies, electronic files, drafts, templates, and derivative materials using Plaintiff's private resident-file / assistance-animal image of Ollie, and to preserve and identify all source files, drafts, print records, authorization records, distribution records, photographs, metadata where available, and communications concerning the creation, approval, posting, display, removal, or continued use of those materials;

10.   damages for unauthorized use and continued display of Plaintiff's private resident-file / assistance-animal image, including not less than $100 per sign per day for each sign posted or displayed after notice demanding removal, or such other amount as the evidence supports;

11.   all other legal and equitable relief to which Plaintiff is entitled.

Respectfully submitted,

/s/ Robert Norton
Robert Norton, Pro Se
2916 Country Lane Drive, Apt. 1223
Temple, Texas 76504
Phone: (617) 717-4525
Fax: None
Email: bob@clevelenterprises.com

**Preliminary Exhibit List**

Exhibit A — January 2023 notice / animal-related enforcement involving Ollie.

Exhibit B — January 6, 2023 email disputing alleged Ollie incident.

Exhibit C — January 9, 2023 letter disputing Kougl enforcement and documenting resident statements.

Exhibit D — January 2023 escalation to Asset Living / Samantha concerning Kougl and assistance-animal enforcement.

Exhibit E — Physician documentation / approval supporting Ollie as an emotional support / assistance animal.

Exhibit F — February 9, 2026 email to Annie Nauta concerning Boxer bathing frequency after public odor comments.

Exhibit G — March 25, 2026 lease-violation notice concerning bagged dog waste / "hazardous materials."

Exhibit H — March 26, 2026 letter to Beverly Daniels requesting exact lease clause, policy, hazardous-waste basis, and factual basis.

Exhibit I — March 2026 pet-waste poster using Ollie's image from resident/application-file materials.

Exhibit I-1 — Evidence, witness statements, communications, file-custody information, or discovery concerning access to, copying of, photographing of, scanning of, transmission of, approval of, printing of, posting of, or removal of Ollie's image from Plaintiff's private resident-file, rental-application, assistance-animal, or disability-accommodation materials.

Exhibit J — March 27, 2026 complaint to Asset Living / Samantha with attachments.

Exhibit K — Asset Living HR ticket acknowledgment, CASE-818655.

Exhibit L — Asset Living HR response returning matter to on-site team / failure to correct.

Exhibit M — April 1, 2026 HUD complaint submission and notice to Defendants.

Exhibit N — Blink camera/device photographs, front and back.

Exhibit O — Blink camera listing / capability evidence.

Exhibit P — May 2026 Temple Police request for investigation concerning possible unlawful audio interception.

Exhibit Q — Resident flyer distributed on or about May 8, 2026 concerning audio-capable cameras and resident privacy.

Exhibit R — May 2026 photographs/video or declaration showing absence of audio-recording signage or notice in common areas.

Exhibit S — Evidence of Friday video-recording incident involving Beverly Daniels or other management, including any video, photos, witness statement, or timeline.

Exhibit T — May 11, 2026 Notice to Vacate for TDHCA-Regulated Affordable Housing, signed by Beverly Daniels, demanding possession within one day.

Exhibit U — May 11, 2026 corrected and supplemental email to Asset Living under CASE-818655 identifying the Notice to Vacate, demanding rescission/no eviction filing, and preserving authority/personal-liability issues.

Exhibit V — May 11, 2026 HR/corporate notice email to Asset Living with resident flyer and written response attachments.

Exhibit W — May 11, 2026 written response denying the disputed lease-violation notice and requesting preservation, to the extent still relevant to the earlier paperwork.

Exhibit X — Delivery video, delivery witness evidence, or preservation demand concerning the May 11 Notice to Vacate.

Exhibit X-1 — May 12, 2026 second Notice to Vacate for TDHCA-Regulated Affordable Housing, signed by Beverly Daniels, demanding possession within three days and attaching three pages of alleged incidents.

Exhibit X-2 — May 12, 2026 legal notice email to Asset Living and Beverly Daniels denying the second Notice to Vacate allegations, identifying escalation after corporate notice, and renewing preservation demands.

Exhibit X-3 — Video evidence and related metadata concerning the May 12 office interaction, the distance of Plaintiff's phone, the instruction to leave the office, and Plaintiff's immediate departure.

Exhibit Y — Spider/common-area maintenance photographs, videos, logs, or resident statements.

Exhibit Z — Pest-control contracts, treatment logs, resident notices, vendor reports, and work orders, when obtained.

Exhibit AA — Resident affidavits/declarations concerning conversations near camera, staff threats, retaliation, lease enforcement, assistance-animal treatment, management culture, resident-on-resident complaints, theft/property-loss complaints, or common-area safety issues.

Exhibit AB — Draft or filed emergency motion papers, proposed TRO, proposed order, and related declarations, if filed.